| | | |
|---|---|---|
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY | : | |
| | : | |
| | : | CIVIL ACTION: |
| Plaintiff | : | Docket No.: |
| | : | |
| vs. | : | |
| | : | |
| JAMAICA WELLNESS MEDICAL, P.C., | : | Plaintiff Demands a |
| BRIJ MITTAL, M.D., MARC LAMPA, D.C., | : | Trial by Jury |
| UNITED WELLNESS CHIROPRACTIC, | : | |
| P.C., GREGORY MILLER a/k/a GREGORI | : | |
| MICKILWSKI, DAILY MEDICAL | : | |
| EQUIPMENT DISTRIBUTION CENTER, | : | |
| INC., LIDA'S MEDICAL SUPPLY, INC., | : | |
| and DAVID SAFIR | : | |
| | : | |
| Defendants | : | |
| | : | |

## COMPLAINT

Plaintiff, State Farm Mutual Automobile Insurance Company ("State Farm Mutual"), by and through its counsel, Goldberg, Miller & Rubin, P.C., brings this action against Defendants, Brij Mittal, M.D., Marc Lampa, D.C., United Wellness Chiropractic, P.C., Gregory Miller, a/k/a Gregori Mickilwski, Daily Medical Equipment Distribution Center, Inc., Lida's Medical Supply, Inc., Jamaica Wellness Medical, P.C., and David Safir and alleges claims for common law fraud, unjust enrichment, conspiracy to commit fraud, aiding and abetting fraud, and declaratory judgment. In support of its claims, Plaintiff alleges the following:

## I.  INTRODUCTION

1.      This action seeks to recover money that the Defendants defrauded from State Farm Mutual through the submission of false, misleading, inaccurate, and fabricated bills, medical records, submitted papers, and supporting documentation. State Farm Mutual relied on

these misrepresentations and made payments to the Defendants. This action also seeks declaratory relief to prevent the above-captioned Defendants from recovering any unpaid bills that were or will be submitted to State Farm Mutual.

2.      As described more fully below, the Defendants operated out of Suite #1EFG at 455 Ocean Parkway, Brooklyn, New York (hereinafter "455 Ocean Parkway"). The Defendants ostensibly provided treatment, testing, and durable medical equipment to individuals, who were involved in motor vehicle accidents and eligible for No-Fault benefits through insurance companies like State Farm Mutual. In reality, the Defendants' operations at 455 Ocean Parkway were designed to maximize insurance reimbursement through the submission of false and misleading documents, bills, medical records, other submitted papers, and supporting documentation.

3.      The Defendants established pre-determined treatment protocols in order to maximize reimbursement by billing for an extensive list of unnecessary and excessive treatment services (examinations, consultations, physical therapy, chiropractic, and other services), testing (including but not limited to computerized range of motion and muscle testing and somatosensory evoked potential testing (hereinafter "SSEP testing")), and equipment purportedly provided to persons who were involved in motor vehicle accidents in New York and covered by policies of insurance issued by State Farm Mutual.

4.      The participants in this scheme to defraud include, *inter alia*, Brij Mittal, M.D., Marc Lampa, D.C., United Wellness Chiropractic, P.C., Gregory Miller, a/k/a Gregori Mickilwski, Daily Medical Equipment Distribution Center, Inc., Lida's Medical Supply, Inc., Jamaica Wellness Medical, P.C., and David Safir. Although these individuals and entities are

ostensibly separate and distinct from one another, they operate with the shared goal of perpetrating the fraudulent scheme described herein.

## II.     <u>JURISDICTION AND VENUE</u>

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

6.     This Court has supplemental jurisdiction over the state law claims raised in this action pursuant to 28 U.S.C. § 1367.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because most, if not all, of the Defendants reside in this district and most, if not all, of the events giving rise to State Farm Mutual's claims occurred in this District.

## III.     <u>THE PARTIES</u>

8.     State Farm Mutual is an Illinois corporation with its principal place of business in Bloomington, Illinois. State Farm Mutual is licensed and engages in the business of insurance in New York.

9.     Defendant, Brij Mittal, M.D. is a physician who has been licensed to practice medicine in New York since August 4, 1978. Dr. Mittal is purportedly the owner of Defendant, Jamaica Wellness Medical, P.C. Dr. Mittal resides in and is a citizen of New York.

10.     Defendant, Marc Lampa, D.C. is a chiropractor who has been licensed to practice chiropractic services in New York since March 28, 2006. Dr. Lampa is purportedly the owner of United Wellness Chiropractic, P.C. Dr. Lampa resides in and is a citizen of New Jersey.

11.     Defendant, Jamaica Wellness Medical, P.C. (hereinafter "Jamaica Wellness") is a New York professional corporation and its principal place of business is Suite #1 EFG at 455

Ocean Parkway, Brooklyn, New York. The purported business of Jamaica Wellness is to provide medical examinations and treatment, physical therapy services and testing to persons involved in motor vehicle accidents.

12.     Defendant, United Wellness Chiropractic, P.C. (hereinafter "United Wellness") is a New York professional service corporation and its principal place of business is Suite #1 EFG at 455 Ocean Parkway, Brooklyn, New York. The purported business of United Wellness is to provide acupuncture examinations, treatment, and services to persons involved in motor vehicle accidents.

13.     Defendant, David Safir resides in and is a citizen of New York. During the relevant time period, Mr. Safir provided services to and participated in operating Jamaica Wellness and United Wellness, including but not limited to billing and collection services. David Safir is not a licensed physician.

14.     Defendant, Gregory Miller a/k/a Gregori Mickilwski resides in and is a citizen of New York. Mr. Miller has used the name Gregori Mickilwski. Mr. Miller owned and operated Daily Medical Equipment Distribution Center and, upon information and belief, may own and operate Lida's Medical Supply, Inc.

15.     Defendant, Daily Medical Equipment Distribution Center, Inc. (hereinafter "Daily Medical") is a New York corporation and its principal place of business is 2660 Gerritsen Avenue, Brooklyn, New York. The purported business of Daily Medical is to fill prescriptions for durable medical equipment to persons involved in motor vehicle accidents.

16.     Defendant, Lida's Medical Supply, Inc. (hereinafter "Lida's Medical") is a New York corporation, and its principal places of business are 1014 Avenue N, #D3, Brooklyn, New

York and 2515 65th Street, Brooklyn, New York. The purported business of Lida's Medical is to fill prescriptions for durable medical equipment to persons involved in motor vehicle accidents.

## IV.    BACKGROUND

17.    State Farm Mutual underwrites automobile insurance in the State of New York.

18.    Pursuant to the Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively "No-Fault Laws"), automobile insurers, like State Farm Mutual, are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to their insureds, which includes up to $50,000.00 to pay for necessary healthcare goods and services.

19.    In exchange for services or goods, insureds can assign their rights to No-Fault Benefits to their providers. Pursuant to an assignment, providers may submit claims directly to an insurance company and receive payment for medically necessary services and goods. Providers may submit the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3"). Providers also may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form"). The provider Defendants submitted these claims, including bills, directly to State Farm Mutual.

20.    Under New York law, only a licensed physician may: (i) practice medicine; (ii) own and control a professional corporation authorized to operate a medical practice; (iii) employ and supervise other physicians; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services. Unlicensed individuals may not: (i) practice medicine; (ii) own or control a professional corporation authorized to operate a medical practice;

5

(iii) employ or supervise physicians; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

21.    The NF-3 Form submitted by healthcare providers to automobile insurers, like State Farm Mutual, must be verified by the health care provider subject to the following:

> Any person who knowingly and with intent to defraud any insurance company or other person files and application for commercial insurance or a statement of claim for any commercial or personal insurance benefits containing materially false information or conceals for the purpose of misleading, information concerning any fact material thereto, and any person in connection with such application or claim, knowingly makes or knowingly assists, abets, solicits or conspires with another to make a false report... commits a fraudulent insurance act...

22.    The HCFA-1500 submitted by healthcare providers to automobile insurers, like State Farm Mutual, must be verified by the health care provider subject to the following:

> Any person who knowingly files a statement of claim containing any misrepresentations or any false, incomplete or misleading information may be guilty of a criminal act punishable under the law and may be subject to civil penalties.

## V.    FACTUAL ALLEGATIONS

23.    The Defendants operated a scheme and conspiracy to defraud No-Fault benefits from insurance companies, including State Farm Mutual. Although the professional corporations at 455 Ocean Parkway are ostensibly independent providers and provide different services (medical/physical therapy services, chiropractor services, and other services), they all operated out of the same space and used the same telephone number, facsimile number, and staff.

24.    Although the providers and professional corporations located at 455 Ocean Parkway have changed over time, David Safir, a layperson, has purportedly "worked" for many of the different entities located at that address, including the Defendants. David Safir has performed bookkeeping, billing and collection work for the Defendant providers located at 455 Ocean Parkway, which involved reviewing the records and being knowledgeable of their

practices. As such, David Safir has knowledge of the inappropriate, unnecessary, false, and fraudulent treatment, testing, services, and referrals provided by the Defendants at 455 Ocean Parkway, was an integral part in carrying out the scheme, received substantial compensation from the Defendants, and continues making these submissions knowing their false and fraudulent nature.

25.     Jamaica Wellness is purportedly owned and controlled by Dr. Mittal even though he did not make any financial investment or borrow any money to start and operate the business. Prior to Jamaica Wellness beginning operations at 455 Ocean Parkway, another clinic known as Parkway Medical Care, P.C. and purportedly owned by Billy Geris, M.D., ceased operations at the same location and the staff of Parkway Medical transferred over to become the staff of Jamaica Wellness. Although Dr. Mittal had no prior relationship with David Safir before the transition from Parkway Medical to Jamaica Wellness, David Safir continued to serve in the same role at Jamaica Wellness that he had served at Parkway Medical.

26.     Even though no consideration was paid to Parkway Medical or Dr. Geris by Dr. Mittal or Jamaica Wellness, the existing patients who were treating at Parkway Medical became the patients of Jamaica Wellness and Parkway Medical's property also transferred over to Jamaica Wellness. Dr. Geris effectively abandoned Parkway Medical, including its patient base, property and intangible value, for no consideration as the business was operating with minimal involvement from him and generating revenue.

27.     In addition to the questionable factual history regarding Jamaica Wellness and Dr. Mittal replacing Parkway Medical and Dr. Geris, Dr. Mittal has provided contradictory testimony concerning the circumstances of how Jamaica Wellness opened at 455 Ocean

Parkway, which exhibits a lack of knowledge that would be expected to be known by a legitimate owner.

28.     Dr. Mittal also operates his other medical office under a different name, without centralizing the staff and operations or building name recognition for his practices. Dr. Mittal would effectively compete with himself if he legitimately owned both medical offices within close proximity.

29.     During the time period that Parkway Medical operated, MK Chiropractic purportedly owned by Mehrzad Kohesieh, D.C., also operated at 455 Ocean Parkway and had a relationship with David Safir. MK Chiropractic had a purported lease/rent agreement with Parkway Medical where it paid money directly to Parkway Medical's landlord in lieu of paying Parkway Medical directly. At the time when Dr. Geris and Parkway Medical were replaced by Dr. Mittal and Jamaica Wellness, MK Chiropractic was permitted to end its purported rent/lease agreement with Parkway Medical and start an agreement with Jamaica Wellness. Later, when MK Chiropractic was replaced by United Wellness, it was able to end its purported lease/rent agreements with Jamaica Wellness and United Wellness was able to start an agreement with Jamaica Wellness in lieu of MK Chiropractic.

30.     These purported rent/lease agreements were/are oral and lack specific terms and other formalities of a legitimate lease, including, for example, a security deposit. There is no signage to suggest that a chiropractic provider even did business at 455 Ocean Parkway. Rather, the patients were directed to the chiropractic providers because of these payments and their participation in the scheme.

31.     United Wellness was purportedly owned and controlled by Marc Lampa, D.C. even though he did not make any financial investment or borrow any money to start and operate

the business. United Wellness was purportedly able to start operations the day after MK Chiropractic ceased operations out of the same space and the staff of MK Chiropractic transferred over to become the staff of United Wellness. David Safir continued the same role he had with MK Chiropractic with United Wellness.

32.     Even though no consideration was paid to MK Chiropractic or to Mehrzad Kohansieh, D.C., the existing patients who were treating at MK Chiropractic became the patients of United Wellness. Dr. Kohansieh effectively abandoned the business to Dr. Lampa for no consideration as the business was operating with minimal involvement from him and generating revenue.

### A.  The Legitimate Treatment of Patients

33.     A legitimate treatment of persons injured by a traumatic event like an automobile accident requires, *inter alia*, a licensed professional to engage in decision making to design a legitimate treatment plan that is tailored to the circumstances of each patient.

34.     During the course of legitimate treatment, treatment plans should be assessed and often modified based upon the circumstances of each patient and his or her response (or lack thereof) to treatment.

35.     Legitimate treatment plans for patients who present with musculoskeletal and/or soft tissue injuries may involve no treatment at all, because these injuries may heal without any intervention or may require a variety of interventions, including medications to reduce inflammation and treatment services from licensed providers.

36.     The decision regarding which, if any, types of treatment are appropriate for each patient, as well as the frequency and duration of the various treatments, should vary depending on the unique circumstances of each patient, including, but not limited to: (a) the patient's age,

social, family and medical history; (b) the patient's physical condition, limitations, and abilities; (c) the location, nature, and severity of the patient's injury and symptoms; and (d) the patient's response to treatment.

37. As described in this Complaint, the Defendants did not administer a legitimate treatment protocol.

### B. Scheme to Defraud

38. As part of the scheme and conspiracy to maximize insurance reimbursement, the Defendants established and implemented an abusive pre-determined treatment protocol. The pre-determined treatment protocol is primarily intended to maximize billing and profit, rather than to provide reasonable or legitimate medical care, and resulted in the Defendants billing for unnecessary and excessive treatment, testing, durable medical equipment, and services. The Defendant providers and professional corporation Defendants of 455 Ocean Parkway shared the patient pool by virtue of financial relationships and their agreement to implement the pre-determined treatment protocol.

39. The Defendants did not legitimately examine, diagnose, test, treat, or service individuals who were involved in motor vehicle accidents and were eligible for No-Fault Benefits through insurance companies, like State Farm Mutual.

40. Rather than establish a plan of treatment uniquely tailored to the individual needs of each patient, the Defendants established a pre-determined treatment protocol intended for all patients, which does not consider the unique and individual needs of the patients.

41. As part of the scheme to defraud and conspiracy to maximize insurance reimbursement, regardless of the patient's actual complaints, physical findings, and injuries, if any, the Defendants, including their employees, independent contractors, and agents, routinely

documented numerous pre-determined and non-credible findings, diagnoses, and injuries to multiple areas of the body for each patient.

42.     As illustrative examples of the pre-determined and non-credible findings, diagnoses, and injuries, the vast majority of patients were diagnosed by the medical providers with an atypically high number amount of injuries, including injuries to their neck and low back. In addition, in the majority of cases, the patient was diagnosed with a shoulder and/or knee injury, the patient was reported to be in "moderate distress", and the patient's condition was reportedly found to be aggravated by: 1) bending; 2) turning; 3) lifting; 4) sitting for long periods of time; 5) walking for long distances; 6) long periods of standing; and 7) strenuous activity. Illustrative examples are identified in *Exhibit "A."*

43.     Similarly, the vast majority of patients were diagnosed by the chiropractic providers with an atypically high number of injuries, including injuries to their neck, mid back, and low back.  More than half of the patients were also diagnosed with a shoulder and/or knee injury, along with a headache, and the patients reportedly exhibited "hypertonicity" and "palpable articular fixations to the neck, mid back, and low back."  Additionally, in the vast majority of cases, the patients reportedly had the following positive or abnormal examination findings: shoulder depression test, straight leg raise test, Kemp's Test, along with having abnormal range of motion to their neck, mid back, and low back.  Illustrative examples are identified in *Exhibit "B."*

44.     These pervasive patterns of patient findings, diagnoses, and injuries are not credible and are highly implausible as they appear across such a wide range of patients for whom ages, pre-existing conditions, types of accident, mechanisms of injury, and a host of other important factors vary markedly.

45. In fact, these non-credible and highly implausible findings, diagnoses, and injuries were pre-determined and fraudulent and were not documented to reflect the patients' actual conditions. Rather, they were documented to support the purported need for treatment, testing, equipment, and other services so that the Defendants would receive billing reimbursement from insurance providers, including State Farm Mutual.

46. Based on the purported need for treatment, testing, equipment, and other services, the Defendants placed almost every patient on the same, pre-determined treatment protocol. The documents, bills, medical records, other submitted papers, and supporting documentation created in furtherance of this pre-determined treatment protocol were fraudulent as the services, testing and equipment purportedly rendered were not medically necessary.

47. The pre-determined treatment protocol at issue consisted of a combination of chiropractic services, physical therapy services, computerized range of motion and muscle testing, SSEP and other testing, and durable medical equipment. Almost every patient received the same pre-determined treatment regardless of any individual issue(s) of the patient. All of this treatment, testing, and services were billed by the Defendants. *(See Exhibits "A" and "C" of this Complaint).*

48. Virtually every patient received the same exact unnecessary and excessive: 1) physical therapy modalities - consisting of therapeutic massage, hot packs and electric stimulation from Jamaica Wellness; and 2) chiropractic services – consisting of chiropractic manipulation (almost always for 3-4 regions) from United Wellness. *(See Exhibit "C" of this Complaint).*

49. This extensive combination of treatment purportedly administered by the Defendants to almost all patients would rarely be appropriate for any one patient's unique needs.

12

Rather, the types of treatments, as well as the frequency and duration of the various treatments, should vary depending on the unique circumstances of each patient, including, but not limited to: (a) the patient's age, social, family and medical history; (b) the patient's physical condition, limitations, and abilities; (c) the location, nature, and severity of the patient's injury and symptoms; and (d) the patient's response to treatment.

50. Additionally, there was a lack of coordination of care between the Defendants to evaluate if the extensive combination of treatments provided was necessary and/or effective.

51. There also was a lack of evaluating and/or modifying the plan of treatment in response to the patient's response, or lack thereof, to treatment or the results of testing.

52. The Defendants also failed to incorporate active modalities, such as exercise, which are well-established as the primary forms of rehabilitation of soft tissue injuries. Rather, the extensive combination of treatments described in this Complaint were not provided for the individual needs of any one patient, but rather were provided pursuant to pre-determined protocols that had the effect of maximizing billing reimbursement.

53. As a further part of the scheme to defraud and conspiracy to maximize insurance reimbursement, the Defendants, and their employees, independent contractors and agents, administered unnecessary computerized range of motion and muscle testing, SSEP and other testing..

54. As described in *Exhibit "A*," rather than determining the individual needs of each patient, the vast majority of patients were ordered to undergo computerized range of motion and muscle testing and SSEP testing.

55. Computerized range of motion testing is performed through the placement of a digital measuring device on various parts of a patient's body while the patient is asked to move

the related joint through its available motion. The results are reflected in a digital reading rather than the estimation of the motion as is done by the administer of the test in a traditional or manual test. In all other respects, the digital test is identical to the manual test. Similarly, the computerized muscle testing is nearly identical to the traditional or manual muscle strength testing except that a digital reading is reflected by identifying the pounds of pressure that the patient exerts while measuring a particular muscle.

56.     Under the circumstances employed by the Defendants, the computerized range of motion and muscle testing were medically unnecessary and were rendered in accordance with a pre-determined treatment protocol which did not aid in the assessment or treatment of the patients. Manual range of motion and muscle strength testing are traditional components of a physical examination. The Defendants did not perform computerized range of motion testing and muscle testing for some additional clinical purpose, but rather these services were performed to increase billing revenue as opposed to aiding patient care.

57.     SSEP testing is a non-invasive test in which peripheral nerves in the arms and legs are stimulated with electrical currents. The evoked potential(s) or response by this electrical stimulation are then recorded by electrodes attached to the scalp. For example, SSEP testing may be medically necessary in conjunction with spinal surgery to alert surgeons to potential problems during surgery. SSEP testing, however, has no utility in diagnosing conditions the Defendants purportedly seek to confirm or rule out. In fact, the Defendants' stated medical necessity of the test include symptoms of "peripheral nerve/roots dysfunction," but the Centers for Medicare and Medicaid indicated that there is no need for SSEP testing to diagnose most neuropathies.

58. Dr. Mittal testified that if a patient presents on the initial visit with any positive finding, as a standard practice he orders computerized range of motion and muscle testing and SSEP testing, regardless of the need of the individual patient. As described in this Complaint, the Defendants document fraudulent and non-credible findings, diagnoses and injuries to support the purported need for this testing.

59. This combination of tests purportedly administered by the Defendants to almost all patients would rarely be appropriate for any one patient's unique needs. Rather, the types of tests, if any, should vary depending on the unique circumstances of each patient, including, but not limited to: (a) the patient's age, social, family and medical history; (b) the patient's physical condition, limitations, and abilities; (c) the location, nature, and severity of the patient's injury and symptoms; and (d) the patient's response to treatment.

60. The results of this extensive testing did not alter or effect the "treatment" administered by the Defendants. Rather, this in-house testing was administered pursuant to an abusive and inappropriate pre-determined treatment protocol that had the effect of maximizing billing revenue.

61. As a further part of the scheme to defraud and conspiracy to maximize insurance reimbursement, the pre-determined treatment protocol also included durable medical equipment that was provided to almost every patient. The durable medical equipment was ordered by the providers at Jamaica Wellness and United Wellness, including Dr. Mittal and Dr. Lampa. Each patient prescribed equipment was billed for numerous pieces of equipment, the most common being a bed board, egg crate mattress, lumbar cushion, TENS, cervical traction, cervical collar, positioning cushion, infrared lamp and a massager. The quantity of durable medical equipment is detailed in *Exhibit "D"*.

62.     Although this durable medical equipment was purportedly ordered by the medical and chiropractic providers for the benefit of the patients, it was inappropriate, excessive, and not necessary. All of this durable medical equipment was provided by Daily Medical Equipment or Lida's Medical. *(See Exhibit "D")*. It is alleged that Gregory Miller (a/k/a Gregori Mickilwski) has a significant role in billing for and providing this inappropriate and unnecessary durable medical equipment and Mr. Miller, Daily Medical Equipment and Lida's Medical were allowed to bill for this equipment because of their participation in, and facilitation of, the scheme described in this Complaint.

63.     Until late 2014, the prescribed durable medical equipment was provided by Daily Medical Equipment. In late 2014, Lida's Medical appears to have replaced Daily Medical Equipment. The two entities share the same exact delivery receipt, address, telephone number, and facsimile number. It is alleged that Lida's Medical is a mere continuation of Daily Medical Equipment.

64.     The pre-determined treatment protocol also included inappropriate and unnecessary current perception threshold testing and EMG/NCV testing and referrals for MRI testing. This testing was inappropriate and was conducted without any monitoring to evaluate whether the patient needed the testing or whether the purported treatment was effective. *(See Exhibit "A" of this Complaint)*. For example, as a standard practice, Dr. Mittal testified that he orders an MRI for each body part for which there is a finding on the initial patient visit. As described in this Complaint, the Defendants documented fraudulent and non-credible findings, diagnoses, and injuries to support the purported need for testing.

65.     The purported test findings had little or no effect on how the provider Defendants managed the patients.  These purported findings, however, supported past and future billings by the Defendants.

66.     The pre-determined treatment protocol also included inappropriate and unnecessary referrals for consultations, including orthopedic/surgical consultations, pain management consultations and psychological consultations.  These consulting providers documented exaggerated and false findings to support the past and future billings of the Defendants.

67.     Defendants' records, documents, bills and other supporting documentation list false, misleading, non-existent and exaggerated medical conditions, complaints, prognoses, diagnoses and injuries, and intentionally deviate from accepted standards of care.  The examinations, treatment, testing, equipment, and services purportedly provided by the Defendants were not reasonable or medically necessary, contained misrepresentations, were often not provided by the provider as identified in the records, documents, bills and submitted papers, and, in some instances, were not provided to the patient.  In spite of this, the Defendants forwarded records, documents, bills and other supporting documentation representing that the services, treatment, referrals, testing and equipment was medically necessary and actually performed.

68.     Although the Defendants are ostensibly separate and distinct from one another, they operate with the shared goal of perpetrating the fraudulent scheme described herein.  In furtherance of this goal, the Defendants also worked together and intentionally designed the pre-determined treatment protocol to include treatment from multiple providers to evade the Fee Schedule restrictions of 11 NYCRR 65-3.15.  By splitting physical therapy modalities amongst

themselves, the Defendants were able to circumvent the Fee Schedule restrictions and bill State Farm Mutual more than they otherwise could.

69.     In connection with the activities of the Defendants giving rise to this action, the Defendants acted with malice, intent, and knowledge. The Defendants knew that the records, documents, bills, submitted papers and supporting documentation were false, inaccurate, and misleading and would be relied upon by State Farm Mutual when making payment decisions.

70.     The Defendants sent the false, fabricated, misleading, and inaccurate records to various individuals and entities, including personal injury attorneys and insurance companies, including State Farm Mutual. These include, but are not limited to, the following:

a.      Records for Patient 1, which were forwarded to State Farm Mutual concerning claim number XX-XXX0-916. The records sent by Defendants include, but are not limited to, those dated 05/29/2012 to 09/24/2012;

b.      Records for Patient 2, which were forwarded to State Farm Mutual concerning claim number XX-XXX4-021. The records sent by Defendants include, but are not limited to, those dated 04/20/2012 to 07/13/2012;

c.      Records for Patient 3, which were forwarded to State Farm Mutual concerning claim number XX-XXX6-713. The records sent by Defendants include, but are not limited to, those dated 04/02/2012 to 04/17/2012;

d.      Records for Patient 4, which were forwarded to State Farm Mutual concerning claim number XX-XXXZ-362. The records sent by Defendants include, but are not limited to, those dated 01/03/2012 to 08/22/2012;

e.      Records for Patient 5, which were forwarded to State Farm Mutual concerning claim number XX-XXXZ-362. The records sent by Defendants include, but are not limited to, those dated 01/03/2012 to 10/09/2012;

f.      Records for Patient 6, which were forwarded to State Farm Mutual concerning claim number XX-XXX8-231. The records sent by Defendants include, but are not limited to, those dated 10/13/2011 to 12/28/2011;

g.      Records for Patient 7, which were forwarded to State Farm Mutual concerning claim number XX-XXX3-946. The records sent by Defendants include, but are not limited to, those dated 06/26/2014 to 07/24/2014;

h.        Records for Patient 8, which were forwarded to State Farm Mutual concerning claim number XX-XXX3-964. The records sent by Defendants include, but are not limited to, those dated 06/30/2014 to 12/30/2014;

i.        Records for Patient 9, which were forwarded to State Farm Mutual concerning claim number XX-XXX3-964. The records sent by Defendants include, but are not limited to, those dated 06/30/2014 to 12/30/2014;

j.        Records for Patient 10, which were forwarded to State Farm Mutual concerning claim number XX-XXXK-041. The records sent by Defendants include, but are not limited to, those dated 06/06/2014 to 09/16/2014;

k.        Records for Patient 11, which were forwarded to State Farm Mutual concerning claim number XX-XXXD-948. The records sent by Defendants include, but are not limited to, those dated 05/19/2014 to 12/19/2014;

l.        Records for Patient 12, which were forwarded to State Farm Mutual concerning claim number XX-XXXR-093. The records sent by Defendants include, but are not limited to, those dated 04/07/2014 to 07/16/2014;

m.        Records for Patient 13, which were forwarded to State Farm Mutual concerning claim number XX-XXX8-608. The records sent by Defendants include, but are not limited to, those dated 03/24/2014 to 11/24/2014;

n.        Records for Patient 14, which were forwarded to State Farm Mutual concerning claim number XX-XXXF-781. The records sent by Defendants include, but are not limited to, those dated 04/11/2014 to 07/21/2014;

o.        Records for Patient 15, which were forwarded to State Farm Mutual concerning claim number XX-XXXN-684. The records sent by Defendants include, but are not limited to, those dated 03/03/2014 to 10/24/2014;

p.        Records for Patient 16, which were forwarded to State Farm Mutual concerning claim number XX-XXXN-684. The records sent by Defendants include, but are not limited to, those dated 02/28/2014 to 11/10/2014;

q.        Records for Patient 17, which were forwarded to State Farm Mutual concerning claim number XX-XXX0-358. The records sent by Defendants include, but are not limited to, those dated 01/22/2014 to 11/25/2014;

r.        Records for Patient 18, which were forwarded to State Farm Mutual concerning claim number XX-XXX4-899. The records sent by Defendants include, but are not limited to, those dated 01/10/2014 to 06/12/2014;

s.      Records for Patient 19, which were forwarded to State Farm Mutual concerning claim number XX-XXXQ-234. The records sent by Defendants include, but are not limited to, those dated 01/23/2014 to 06/19/2014;

t.      Records for Patient 20, which were forwarded to State Farm Mutual concerning claim number XX-XXXQ-234. The records sent by Defendants include, but are not limited to, those dated 01/23/2014 to 06/19/2014;

u.      Records for Patient 21, which were forwarded to State Farm Mutual concerning claim number XX-XXX4-425. The records sent by Defendants include, but are not limited to, those dated 11/20/2013 to 05/30/2014;

v.      Records for Patient 22, which were forwarded to State Farm Mutual concerning claim number XX-XXX2-431. The records sent by Defendants include, but are not limited to, those dated 11/25/2013 to 12/19/2013;

w.      Records for Patient 23, which were forwarded to State Farm Mutual concerning claim number XX-XXX3-995. The records sent by Defendants include, but are not limited to, those dated 08/05/2013 to 12/19/2013;

x.      Records for Patient 24, which were forwarded to State Farm Mutual concerning claim number XX-XXX8-108. The records sent by Defendants include, but are not limited to, those dated 03/18/2013 to 10/29/2013;

y.      Records for Patient 25, which were forwarded to State Farm Mutual concerning claim number XX-XXX4-204. The records sent by Defendants include, but are not limited to, those dated 03/20/2013 to 06/20/2013;

z.      Records for Patient 26, which were forwarded to State Farm Mutual concerning claim number XX-XXX1-332. The records sent by Defendants include, but are not limited to, those dated 04/01/2012 to 05/30/2013;

aa.     Records for Patient 27, which were forwarded to State Farm Mutual concerning claim number XX-XXX9-242. The records sent by Defendants include, but are not limited to, those dated 10/15/2012 to 05/30/2013;

bb.     Records for Patient 28, which were forwarded to State Farm Mutual concerning claim number XX-XXX1-177. The records sent by Defendants include, but are not limited to, those dated 07/11/2012 to 01/17/2013;

cc.     Records for Patient 29, which were forwarded to State Farm Mutual concerning claim number XX-XXXG-230. The records sent by Defendants include, but are not limited to, those dated 12/19/2014 to 12/31/2014;

dd. Records for Patient 30, which were forwarded to State Farm Mutual concerning claim number XX-XXX0-995. The records sent by Defendants include, but are not limited to, those dated 12/08/2014 to 01/09/2015;

ee. Records for Patient 31, which were forwarded to State Farm Mutual concerning claim number XX-XXX6-516. The records sent by Defendants include, but are not limited to, those dated 11/17/2014 to 12/31/2014;

ff. Records for Patient 32, which were forwarded to State Farm Mutual concerning claim number XX-XXX2-178. The records sent by Defendants include, but are not limited to, those dated 03/13/2015 to 04/29/2015;

gg. Records for Patient 33, which were forwarded to State Farm Mutual concerning claim number XX-XXX2-178. The records sent by Defendants include, but are not limited to, those dated 03/18/2015-03/31/2015;

hh. Records for Patient 34, which were forwarded to State Farm Mutual concerning claim number XX-XXX2-178. The records sent by Defendants include, but are not limited to, those dated 03/18/2015-04/22/2015;

ii. Records for Patient 35, which were forwarded to State Farm Mutual concerning claim number XX-XXXX-624. The records sent by Defendants include, but are not limited to, those dated 03/18/2015 to 04/30/2015;

jj. Records for Patient 36, which were forwarded to State Farm Mutual concerning claim number XX-XXXD-251. The records sent by Defendants include, but are not limited to, those dated 03/17/2015 to 05/05/2015;

kk. Records for Patient 37, which were forwarded to State Farm Mutual concerning claim number XX-XXX6-612. The records sent by Defendants include, but are not limited to, those dated 03/24/2015 to 04/23/2015;

ll. Records for Patient 38, which were forwarded to State Farm Mutual concerning claim number XX-XXXZ-496. The records sent by Defendants include, but are not limited to, those dated 04/06/2015 to 04/30/2015;

mm. Records for Patient 39, which were forwarded to State Farm Mutual concerning claim number XX-XXXK-670. The records sent by Defendants include, but are not limited to, those dated 04/01/2012 to 06/27/2013;

nn. Records for Patient 40, which were forwarded to State Farm Mutual concerning claim number XX-XXXX-170. The records sent by Defendants include, but are not limited to, those dated 10/08/2014 to 12/26/2014;

oo.   Records for Patient 41, which were forwarded to State Farm Mutual concerning claim number XX-XXX7-767. The records sent by Defendants include, but are not limited to, those dated 03/03/2015 to 4/30/2015;

pp.   Records for Patient 42, which were forwarded to State Farm Mutual concerning claim number XX-XXX1-025. The records sent by Defendants include, but are not limited to, those dated 02/09/2015 to 02/12/2015;

qq.   Records for Patient 43, which were forwarded to State Farm Mutual concerning claim number XX-XXX7-649. The records sent by Defendants include, but are not limited to, those dated 07/25/2014 to 12/18/2014;

rr.   Records for Patient 44, which were forwarded to State Farm Mutual concerning claim number XX-XXX6-434. The records sent by Defendants include, but are not limited to, those dated 10/1/2015 to 4/7/2016;

ss.   Records for Patient 45, which were forwarded to State Farm Mutual concerning claim number XX-XXX9-203. The records sent by Defendants include, but are not limited to, those dated 10/19/2015-2/1/2016;

tt.   Records for Patient 46, which were forwarded to State Farm Mutual concerning claim number XX-XXX6-911. The records sent by Defendants include, but are not limited to, those dated 09/30/2015 to 03/30/2016;

uu.   Records for Patient 47, which were forwarded to State Farm Mutual concerning claim number XX-XXX9-303. The records sent by Defendants include, but are not limited to, those dated 11/23/2015 to 2/29/2016;

vv.   Records for Patient 48, which were forwarded to State Farm Mutual concerning claim number XX-XXXT-462. The records sent by Defendants include, but are not limited to, those dated 12/23/2015 to 04/27/2016;

ww.   Records for Patient 49, which were forwarded to State Farm Mutual concerning claim number XX-XXX4-557. The records sent by Defendants include, but are not limited to, those dated 01/12/2016 to 04/29/2016;

xx.   Records for Patient 50, which were forwarded to State Farm Mutual concerning claim number XX-XXX7-171. The records sent by Defendants include, but are not limited to, those dated 04/03/2015 to 06/18/2015;

yy.   Records for Patient 51, which were forwarded to State Farm Mutual concerning claim number XX-XXXL-695. The records sent by Defendants include, but are not limited to, those dated 08/27/2015 to 04/22/2016;

zz.  Records for Patient 52, which were forwarded to State Farm Mutual concerning claim number XX-XXX5-534. The records sent by Defendants include, but are not limited to, those dated 12/08/2015 to 04/28/2016;

aaa.  Records for Patient 53, which were forwarded to State Farm Mutual concerning claim number XX-XXXC-356. The records sent by Defendants include, but are not limited to, those dated 12/23/2015 to 02/10/2016;

bbb.  Records for Patient 54, which were forwarded to State Farm Mutual concerning claim number XX-XXXC-356. The records sent by Defendants include, but are not limited to, those dated 12/24/2015 to 02/10/2016;

ccc.  Records for Patient 55, which were forwarded to State Farm Mutual concerning claim number XX-XXX9-111. The records sent by Defendants include, but are not limited to, those dated 06/17/2015- 12/21/2015;

ddd.  Records for Patient 56, which were forwarded to State Farm Mutual concerning claim number XX-XXX6-192. The records sent by Defendants include, but are not limited to, those dated 03/02/2012 to 03/09/2012;

eee.  Records for Patient 57, which were forwarded to State Farm Mutual concerning claim number XX-XXXL-695. The records sent by Defendants include, but are not limited to, those dated 08/27/2015 to 04/22/2016;

fff.  Records for Patient 58, which were forwarded to State Farm Mutual concerning claim number XX-XXXL-695. The records sent by Defendants include, but are not limited to, those dated 08/27/2015 to 04/22/2016; and

ggg.  Records for Patient 59, which were forwarded to State Farm Mutual concerning claim number XX-XXX0-483. The records sent by Defendants include, but are not limited to, those dated 08/01/2013 to 05/08/2014.

hhh.  Records for Patient 60, which were forwarded to State Farm Mutual concerning claim number XX-XXXP-272. The records sent by Defendants include, but are not limited to, those dated 01/04/2016 to 07/19/2016.

iii.  Records for Patient 61, which were forwarded to State Farm Mutual concerning claim number XX-XXXV-365. The records sent by Defendants include, but are not limited to, those dated 12/16/2014 to 04/18/2015.

jjj.  Records for Patient 62, which were forwarded to State Farm Mutual concerning claim number XX-XXXV-365. The records sent by Defendants include, but are not limited to, those dated 12/16/2014 to 04/18/2015.

kkk.   Records for Patient 63, which were forwarded to State Farm Mutual concerning claim number XX-XXXV-787. The records sent by Defendants include, but are not limited to, those dated 04/28/2016 to 07/27/2016.

71.   The records enumerated above were false, fabricated, misleading and inaccurate for the reasons specified in this Complaint, including the establishment and implementation of pre-determined treatment protocols designed to maximize insurance reimbursement through the submission of false and misleading patient findings, conditions, diagnoses, injuries and the billing of unnecessary and excessive treatment, services, testing and equipment. Defendants continue to submit these records.

72.   State Farm Mutual is under statutory and contractual obligations to promptly and fairly process claims within thirty (30) days. The facially-valid documents submitted to State Farm Mutual and supporting documentation in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause State Farm Mutual to rely upon them. As a result, State Farm Mutual incurred damages of more than $500,000.00 representing payments made by State Farm Mutual.

73.   At all times relevant hereto, Defendants knew, or should have known, that State Farm Mutual was relying on the truth and accuracy of Defendants' records, documents, bills, and other submitted papers and supporting documentation in determining amounts payable to Defendants.

74.   Defendants fraudulently concealed their involvement in the fraudulent scheme described in this Complaint. During the relevant times, in connection with the activities of the Defendants giving rise to this action, Defendants intentionally acted to fraudulently conceal the nature of their activities in order to insulate themselves from liability for the fraudulent and illegal activities they were undertaking, including, but not limited to: (1) fabricating and/or

24

preparing records, documents, bills, other submitted papers and supporting documentation in such a manner that a reasonable insurance company would believe that reasonable and necessary medical treatment was provided, was provided for the medical benefit of the patient, was medically necessary, and was provided by the provider identified in the records; (2) replacing providers and professional corporations at 455 Ocean Parkway; and (3) concealing the fact that treatment, services and testing was provided for the financial gain of the Defendants and not for the medical benefit of the patient or for medical necessity.

75. Despite State Farm Mutual's exercise of reasonable diligence, including but not limited to, claim representatives reviewing and evaluating individual claims, and reviewing the records, documents, bills and other supporting documentation submitted by the Defendants, only after examining multiple claims collectively and engaging in other appropriate activities, was the fraudulent activity of the Defendants discovered by State Farm Mutual. Due to the fraudulent concealment of their activities by the Defendants, as outlined above, the fraudulent activity of the Defendants was not discovered until sometime after April 2013.

76. State Farm Mutual was injured in its business and property by Defendants' misrepresentations, violations of law, fraudulent conduct and other acts and omissions committed by the Defendants as set forth above. Such injury includes: the loss of monies paid pursuant to and/or as a result of false, fraudulent, inflated, and/or misrepresented claims for medical benefits as well as other injury as may be proved at trial. The relief sought by State Farm Mutual against Defendants includes compensatory damages, payments made by State Farm Mutual to Defendants, and all other relief this Court finds just, equitable, and warranted by applicable law.

## VI.    CAUSES OF ACTION

### COUNT I
### Common Law Fraud
### Against All Defendants

77.    State Farm Mutual incorporates by reference the allegations set forth above.

78.    Defendants intentionally and knowingly made false and fraudulent statements of material fact to State Farm Mutual regarding treatment purportedly provided to State Farm Mutual insureds at 455 Ocean Parkway in Brooklyn, New York.

79.    Defendants knew that the statements they made to State Farm Mutual were false and fraudulent when they were made because the statements pertained to purported findings, which Defendants knew were pre-determined, boilerplate, greatly exaggerated, or fabricated. The statements also pertained to treatment and testing which the Defendants knew was pre-determined, boilerplate, not medically reasonable or necessary, or not actually provided.

80.    Defendants made the false and fraudulent statements in order to induce No-Fault Benefits from State Farm Mutual.

81.    State Farm Mutual justifiably relied on Defendants misrepresentations and paid Defendants more than $500,000.00 in No-Fault Benefits.

82.    State Farm Mutual would not have made payments to Defendants had it known that Defendants' bills and supporting documentation falsely and fraudulently documented findings and treatment that were not medically reasonable or necessary or, in some instances, not actually provided.

83.    The Defendants' conduct was willful, wanton, and/or reckless.

WHEREFORE, State Farm Mutual demands judgment against the Defendants for compensatory damages, costs, and other such relief as this Honorable Court finds just, equitable,

and warranted by applicable law.

## COUNT II
### Unjust Enrichment
### Against All Defendants

84. State Farm Mutual incorporates by reference the allegations set forth above.

85. State Farm Mutual conferred a benefit upon Defendants by paying Defendants' bills for services that were not provided and by paying for services that were not medically reasonable or necessary and were provided pursuant to an abusive pre-determined treatment protocol.

86. Defendants voluntarily accepted payments from State Farm Mutual knowing that they were wrongfully obtained.

87. As a result, Defendants wrongfully obtained hundreds of thousands of dollars from State Farm Mutual.

88. It would be inequitable to permit Defendants to retain money that they fraudulently obtained from State Farm Mutual.

WHEREFORE, State Farm Mutual demands judgment against the Defendants for compensatory damages, costs, and other such relief as this Honorable Court finds just, equitable, and warranted by applicable law.

## COUNT III
### Conspiracy to Commit Fraud
### Against All Defendants

89. State Farm Mutual incorporates by reference the allegations set forth above.

90. Defendants were intentionally and knowingly party to corrupt agreements as evidenced by their shared sublease/rent agreements, office space, staff, equipment, and common pattern of false, misleading, fabricated findings, along with their agreement to participate and

implement the treatment protocol as described in this Complaint.

91.   Defendants furthered their shared conspiracy with each submission of a bill and supporting documentation to State Farm Mutual.

92.   Defendants' intentional participation in the scheme to defraud State Farm Mutual is evidenced by each bill and supporting documentation Defendants submitted to State Farm Mutual.

93.   State Farm Mutual suffered damages in No-Fault Benefits payments made to Defendants based on Defendants' misrepresentations.

WHEREFORE, State Farm Mutual demands judgment against the Defendants for compensatory damages, costs, and other such relief as this Honorable Court finds just and equitable and warranted by applicable law.

## COUNT IV
### Aiding and Abetting Fraud
### Against All Defendants

94.   State Farm Mutual incorporates by reference the allegations set forth above.

95.   Defendants participated in a scheme to defraud State Farm Mutual described above.

96.   Defendants had actual knowledge that the other Defendants in this action were committing fraud against State Farm Mutual.

97.   Defendants provided substantial assistance to one another to perpetuate the scheme to defraud described above by, *inter alia*, submitting false, fabricated, and/or exaggerated records, documents, bills, other papers, and supporting documentation to State Farm Mutual and by supporting the fraudulent and/or medically unreasonable care provided by the other providers at 455 Ocean Avenue.

WHEREFORE, State Farm Mutual demands judgment against the Defendants for compensatory damages, costs, and other such relief as this Honorable Court finds just and equitable and warranted by applicable law.

## COUNT V
### Declaratory Judgment

98.     State Farm Mutual incorporates by reference the allegations set forth above.

99.     State Farm Mutual seeks declaratory relief pursuant to 28 U.S.C. § 2201.

100.     There is an actual case in controversy between State Farm Mutual and Defendants relating to claims for the alleged services provided to State Farm Mutual's insureds. These claims continue to be submitted by the Defendants to State Farm Mutual.

101.     In each and every claim submitted to State Farm Mutual, Defendants knowingly made one or more of the material misrepresentations described above.

102.     The Defendants have no legal or equitable right to receive payment from State Farm Mutual on any bill submitted to State Farm Mutual for claims that include false, misleading, inaccurate, and/or fabricated records, reports, bills, other documents, statements, and representations.

103.     The Defendants have no legal or equitable right to receive payment from State Farm Mutual on any bill submitted to State Farm Mutual for claims that include examinations, treatment, testing, equipment and services that were not provided, not reasonable or necessary, or include records that document subjective complaints, physical examination findings, diagnoses, and prognoses, which were pre-determined, exaggerated and/or false.

104.     The Defendants have no right to receive payment for any bills submitted to State Farm Mutual because the services provided by Defendants are medically unnecessary and have been ordered and performed – to the extent that they have been performed at all – pursuant to

fraudulent, pre-determined protocols designed solely to maximize charges to insurance companies including State Farm Mutual, not because they are medically necessary or designed to facilitate the treatment of or otherwise benefit State Farm Mutual insureds.

105.    The Defendants have no legal or equitable right to receive payment from State Farm Mutual on any bill that amounts to a fraudulent insurance act under New York law.

106.    The Defendants have no legal or equitable right to receive payment from State Farm Mutual for any professional corporation that was not eligible to bill for or collect No-Fault Benefits because it was unlawfully incorporated and/or owned or controlled by an unlicensed individual.

107.    State Farm Mutual requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§2201 and 2202, declaring that:

    (i)    State Farm Mutual has no legal or equitable obligation to pay Defendants for any submitted bills;

    (ii)    State Farm Mutual has no legal or equitable obligation to pay Defendants for any bills submitted that include false, misleading, inaccurate, and/or fabricated medical records, reports, bills, and other documents, statements and representations;

    (iii)    State Farm Mutual has no legal or equitable obligation to pay Defendants for any bills submitted for examinations, treatment, testing, equipment or services that were not provided, were not reasonable or necessary, or that are based on medical records that document subjective complaints, physical examination findings, diagnoses, and/or prognoses, which were pre-determined, exaggerated and/or false;

(iv)  The Defendants have no right to receive payment for bills submitted to State Farm Mutual because Defendants' healthcare services and goods were not medically necessary;

(v)  The Defendants have no right to receive payment for any bills submitted to State Farm Mutual because Defendants' healthcare services and goods were performed and dispensed pursuant to a pre-determined fraudulent protocol;

(vi)  The Defendants have no right to receive payment for any bills if they operate in violation of New York law; and

(vii)  The Defendants have no right to receive payments for any bills submitted to State Farm Mutual because pre-determined treatment protocols were established by the Defendants in order to bill for unnecessary, excessive treatment regardless of the actual medical needs of each individual patient, and to maximize the potential charges that they caused to be submitted to State Farm Mutual.

WHEREFORE, State Farm Mutual demands judgment against the Defendants for declaratory judgment, compensatory damages, costs, and other such relief as this Honorable Court finds just and equitable and warranted by applicable law.

## VII.  JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm Mutual demands a trial by jury.

Respectfully submitted,

**GOLDBERG, MILLER & RUBIN, P.C.**

BY: _____

MATTHEW MORONEY, ESQUIRE (mm6572)
767 Third Avenue
24th Floor
New York, NY 10017
646-863-1531
*Counsel for Plaintiff*
*State Farm Mutual Automobile Insurance Company*

DATED: _9- 6-/6_